

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 5, 2019

**BY ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States</u> v. <u>Muftau Adamu</u>, S1 18 Cr. 201 (DLC)

Dear Judge Cote:

      The defendant in the above-captioned case, Muftau Adamu, is scheduled to be sentenced on June 7, 2019 at 10:30 a.m., after pleading guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. The Government respectfully submits this letter in advance of the sentencing and in response to the defendant's sentencing submission filed on May 30, 2019 (ECF No. 113).

      As an initial matter, the Government does not have any objections to the Presentence Investigation Report revised on May 6, 2019 (the "PSR"), which determined that the defendant's applicable United States Sentencing Guidelines (the "Guidelines") sentence is 51 to 63 months' imprisonment and recommended a sentence of 51 months' imprisonment. (PSR ¶ 129.) For the reasons set forth below, the Government respectfully submits that the Court sentence the defendant to a term of imprisonment within the Guidelines sentencing range, which would be sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

### I.    APPLICABLE LAW

      As the Court is aware, the Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Hon. Denise L. Cote
June 5, 2019
Page 2 of 5

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

## II.   DISCUSSION

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports the imposition of a Guidelines sentence of 51 to 63 months' imprisonment.

### A.   The Seriousness of the Defendant's Conduct

First, a sentence within the Guidelines range is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for the offense. Here, the defendant was a member of a criminal enterprise (the "Enterprise") based in Ghana that was involved in defrauding more than 100 American businesses and individuals of more than $10 million through business email compromises and romance scams, the general details of which are discussed at length in the PSR. (*See* PSR ¶¶ 21-23.) Based on information known to the Government, the defendant was an integral member of the conspiracy for more than three years, beginning in at least January 2015 through the date of his arrest in June 2018. He directed some of his co-defendants to receive fraud proceeds in bank accounts that they controlled and instructed them on how to withdraw the funds and transfer them to other members of the

Hon. Denise L. Cote
June 5, 2019
Page 3 of 5

conspiracy, thereby laundering the funds to avoid detection. The defendant also himself opened and maintained bank accounts to receive funds stolen from victims and launder them to coconspirators based in Ghana. In total, Adamu received more than approximately $760,000 in fraud proceeds from at least 29 victims in at least three different banks accounts that he controlled. (*Id.* ¶ 46.) Assuming that the defendant conservatively earned 15% of the approximately $760,000 that went through his bank accounts as his cut of the fraud proceeds, which is consistent with text messages that he exchanged with co-defendant Tourey Rufai, Adamu made a profit of more than approximately $110,000 from his involvement in the conspiracy. In terms of relative culpability of the five defendants who pleaded guilty in this case, Adamu is the second most culpable based on his role in the conspiracy and the loss amount and number of victims. (*See id.* ¶¶ 45-49.)

As an example of one of the many fraud transactions the defendant was involved in, in November 2017, an employee of a real estate company in Manhattan ("Victim-1") received fraudulent emails from individuals purporting to be a known lawyer for Victim-1 and a second known individual who oversaw Victim-1's finances. Those emails, which were sent by members of the Enterprise as part of a business email compromise, directed the employee to transfer a total of over $750,000 to three different bank accounts. (PSR ¶ 26.) One of those three bank accounts that received funds from Victim-1 was controlled by a 69-year-old single woman ("Victim-2") residing in Wisconsin who was the victim of a romance scam. (*Id.* ¶ 28.) Victim-2 was led into believing that she was in an online relationship with a purported male individual who convinced Victim-2 through false statements to send both her own money and the money she received from Victim-1 to other members of the Enterprise, including Adamu and Rufai. Victim-2 was therefore unwittingly used to launder fraud proceeds received from Victim-1.

Before Victim-2 transferred the fraud proceeds into an account controlled by Rufai in a fake name, Adamu texted Rufai to ask whether the account was "still active." (*See* Exhibit A.) After Rufai confirmed that it was active, Victim-2 was instructed to deposit the money into the account and Adamu then told Rufai that it was "time for pick up" and expressed the need to have a "fresh account" to receive the funds. (*Id.*) Adamu and Rufai also agreed that Rufai would receive 15% of the funds as his cut. (*Id.*) Importantly, when Adamu was giving these instructions to Rufai, Adamu also texted Rufai a screenshot of a text message conversation between Victim-2 and the person directing her to deposit money into Rufai's account. Adamu was therefore either in direct contact with Victim-2 or the individual who was in direct contact with Victim-2. Indeed, Adamu also directly received a transfer of $16,700 from Victim-2 in March 2017, eight months before the transfer to Rufai's account, based on the false representation made to Victim-2 that Adamu was a gold broker. (PSR ¶ 28(f).) Finally, in another example dating back to February 2015, Adamu received a total of approximately $270,000 from a 67-year-old widow who was living alone and lost her retirement savings through the frauds committed by the Enterprise. (*Id.* ¶ 32.)

The defendant also communicated extensively with other members of the Enterprise in connection with the conspiracy. Specifically, based on the Government's searches of two phones seized from Rufai at the time of his arrest, Adamu and Rufai exchanged text messages that totaled more than 400 pages in length, a majority of which concerned the receipt and

laundering of fraud proceeds.  In these text messages, for example, Adamu explained to Rufai that he could still get money from his bank account even after the bank had closed the account due to suspicious activity.  (*See* Exhibit B.)  In another example, Adamu explains to Rufai how they can make a large deposit of fraud proceeds via check and use a particular bank's ATM to withdraw thousands of dollars each day.  (*See* Exhibit C.)  Finally, in a third set of text messages, Adamu asks Rufai to send over details for a new bank account in a fake name that Adamu uses to direct the deposit of fraud proceeds.  (*See* Exhibit D.)   When Rufai confirms that he received the money and it is available for pick up, Adamu comments on how Rufai is a "good business partner."   These text messages reveal that Adamu was an experienced fraudster who knew how to most effectively launder money and which banks to use to avoid detection.

As described above, this extensive conduct by the defendant over three years in receiving and laundering more than approximately $760,000 in fraud proceeds from at least 29 victims and directing others to do the same is serious.  Real victims were hurt by the crimes committed by the defendant and his role in the conspiracy, which was integral to committing the frauds and getting the money to coconspirators in Ghana.  For these reasons, the seriousness of the defendant's conduct and the need to provide just punishment warrant a Guidelines sentence of imprisonment.

### B.       The Need for Adequate Specific Deterrence

Second, a significant sentence of imprisonment within the Guidelines range is necessary for specific deterrence to this defendant and to protect the public from further crimes of the defendant.  During his three years involved in the instant offense, Adamu was gainfully employed, was involved in a romantic relationship, and had a young child.  The defendant also appears to have had the support of several family members and friends, some of whom wrote letters to the Court in connection with this sentencing.  Nevertheless, despite all of this support and the fact that the defendant was certainly aware of the potential legal consequences of his criminal conduct, the defendant chose to begin engaging in the instant offense the same year that he became a U.S. citizen.  The defendant claims in his letter to the Court that he "did not take into consideration" the fact that his conduct may result in him facing jail time and being separated from his family and friends.  But this rings hollow in light of text messages in which Adamu and Rufai discuss why they "hustle" – to "take risk and go make good use of it." (*See* Exhibit E.)  Adamu was therefore fully aware of the criminal nature of his conduct, but the fact that he would put so much at risk despite what appears to be substantial family and community support is indicative of the need for specific deterrence.  Accordingly, a sentence within the Guidelines range is necessary to discourage the defendant from committing further crimes following his release from prison and to impress upon him the serious consequences of his criminal conduct.

### C.       The Need for General Deterrence and Respect for the Law

Third, a Guidelines sentence of imprisonment is appropriate to ensure adequate general deterrence and to promote respect for the law.  As the Court is aware, this case has attracted some media attention, including in Ghana.  A prison sentence within the Guidelines range is

Hon. Denise L. Cote
June 5, 2019
Page 5 of 5

necessary to send a message to other similarly situated individuals and the public that participating in business email compromises and romance scams in any capacity will not be treated leniently and will entail a significant period of incarceration. Such a message is particularly important at a time when such crimes, which are often difficult to prosecute, have become commonplace. Indeed, in 2018, the Better Business Bureau estimated that there were more than one million victims of romance scams in the United States who collectively lost over $1 billion over the last three years.[1] Also in 2018, people reported losing $143 million from romance scams to the Federal Trade Commission ("FTC"), which is a higher total than for any other type of scam reported to the FTC.[2] Further, based on data collected by the FBI, between October 2013 and May 2018, U.S. victims lost a total of approximately $3 billion to business email compromises, which have been increasing since December 2016.[3] It is therefore important that those who would consider engaging in these forms of criminal conduct understand that the consequences will be serious. Accordingly, a sentence within the Guidelines range is both necessary and appropriate to promote general deterrence and respect for the law.

### III. CONCLUSION

For the reasons set forth above, Government respectfully submits that a Guidelines sentence of 51 to 63 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing and would be fair and appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Sagar K. Ravi
Assistant United States Attorney
(212) 637-2195

---

[1] *See* https://www.bbb.org/article/news-releases/17057.
[2] *See* https://www.consumer.ftc.gov/blog/2019/02/romance-scams-will-cost-you
[3] *See* https://www.ic3.gov/media/2018/180712.aspx

# Exhibit A

**November 22-24 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

| | |
|---|---|
| ADAMU: | Boa still active? |
| RUFAI: | Yap |
| RUFAI: | Y |
| ADAMU: | Job go come [sends photo of wire transfer form from Victim-2] |
| ADAMU: | Time for pick up |
| RUFAI: | E no come oo |
| […] | |
| ADAMU: | I want fresh account I no want problem again |
| RUFAI: | U right |
| ADAMU: | [sends screenshot of text message with Victim-2] |
| ADAMU: | Check from ur side |
| […] | |
| ADAMU: | 46,500, 15% u like?? |
| RUFAI: | Cool |
| ADAMU: | OK |

# **EXHIBIT B**

**October 6, 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

| | |
|---|---|
| RUFAI: | The bank send me letter th[a]t they close the account |
| RUFAI: | I can't have access on my phone self so like I want is to go there and see whatapp |
| ADAMU: | Them go send u check too |
| RUFAI: | Ok like th[a]t will be fine waaa |
| ADAMU: | Yea call them |
| RUFAI: | Ok |
| ADAMU: | Them go send you check with all the money inside |
| RUFAI: | Cool |
| ADAMU: | Call them |
| RUFAI: | Ok |
| ADAMU: | Send me the pic of the letter |
| ADAMU: | When you call them ask them about those international wire |

# **EXHIBIT C**

**October 10, 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

| | |
|---|---|
| RUFAI: | I go deposit[] the 23$ for my chase |
| ADAMU: | Is that possible?? |
| RUFAI: | We will confirm first see |
| ADAMU: | Ok but we can deposit the check and use the ATM to withdraw 3k everyday and if somebody want make large purchase then we swipe mana |
| RUFAI: | Ok but any large purchase we will need an[] id |
| ADAMU: | Not all dey ask ID |
| ADAMU: | Chase their ATM is good cuz they can give 3K cash sef |
| RUFAI: | Yeah I know but the amount is 46k remember |
| ADAMU: | Yea I think they can give 5k sef ATM |
| RUFAI: | Ok |
| ADAMU: | I try the one on 3rd ave sef |
| ADAMU: | But try Mubarak first morrow see |
| RUFAI: | Ok will go to the chase bank and talk to the banker and see |
| RUFAI: | Some Nigerian guy |
| ADAMU: | Ask him how much the ATM can give u a day the max |
| RUFAI: | Ok will go there and ask him |

# **EXHIBIT D**

**November 7, 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

ADAMU:   Send boa

RUFAI:   The new one?

ADAMU:   Sharp

RUFAI:   [Provides account details for bank account in name of "Joe Thompson"]

ADAMU:   [sends image of deposit slip]

RUFAI:   Ok this no be the 10k people

ADAMU:   Same ppl

ADAMU:   E come?

RUFAI:   Make I check

ADAMU:   Ok

RUFAI:   E come

ADAMU:   Ok

RUFAI:   Available for pick up

ADAMU:   On my way!

ADAMU:   Yaayi I love dealing with you . . . Good business partner

# **EXHIBIT E**

**November 24, 2017**

**Excerpt of WhatsApp Messenger chats between Rufai, who was using the moniker "I Love God," and Muftau Adamu, who was using the moniker "Loyalty"**

ADAMU:    Business go come

RUFAI:    Cos I wanna look sharp wallahi

ADAMU:    Usra need future lol

RUFAI:    Allah wanna secure am fast and furious

ADAMU:    That's why we dey hustle

RUFAI:    Allah

RUFAI:    Wanna try build two houses on tht land

ADAMU:    Some 5 years time if we no die we for dey house most of our time than yankee

RUFAI:    Wallahi man

ADAMU:    America no be easy

RUFAI:    Take risk and go make good use of it

ADAMU:    That's all

RUFAI:    U staying for long

ADAMU:    Naa 1 month . . . Like you